IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL F. MILAM | : | |
| Plaintiff, | : | Case No. 2:11-cv-77 |
| v. | : | JUDGE ALGENON L. MARBLEY |
| AMERICAN ELECTRIC POWER LONG TERM DISABILITY PLAN, | : | Magistrate Judge Elizabeth Preston Deavers |
| Defendant. | : | |

**OPINION AND ORDER**

**I. INTRODUCTION**

This is an ERISA case in which Plaintiff Paul Milam ("Plaintiff" or "Milam") alleges that Defendant American Electric Power Long Term Disability Plan ("Defendant" or "the Plan") violated its terms when it offset Milam's third party settlement proceeds from future long-term disability benefits and requested reimbursement for net overpayment in the amount of $29,732.20. The Plan and its fiduciary, American Electric Power Service Corporation ("AEPSC"), (collectively referred to as "Counter-Claimants") brought a counter-claim against Milam requesting that this Court: enforce the Plan; impose a constructive trust on alleged overpaid benefits in Milam's possession; uphold the Plan's right to obtain reimbursement from Milam; and offset Milam's future benefits for 60 months. This matter is now before the Court on Milam's Motion for Judgment on the Administrative Record, (Doc. 30), the Plan's Motion for Judgment on the Administrative Record, (Doc. 31), and Counter-Claimants' Motion for Summary Judgment on their Counter-Claim, (Doc. 31).

This Court held a hearing where both parties had the opportunity to be heard. For the following reasons, Milam's Motion for Judgment on the Administrative Record is **DENIED**, the Plan's Motion for Judgment on the Administrative Record is **DENIED**, and Counter-Claimants' Motion for Summary Judgment on their Counter-Claim is **DENIED**. The parties are **ORDERED** to brief the issue of whether Milam has been made whole. The parties should file opening briefs in 21 days, or by October 15, 2012, and response briefs 14 days thereafter, or by October 29, 2012. Milam's benefits shall be reinstated until there has been a determination as to whether he has been made whole.

## II. BACKGROUND

*A. Relevant Facts*

American Electric Power ("AEP") employed Milam for 30 years. On October 29, 2006, he was severely injured in an automobile accident. As a result of the accident, he was unable to return to work.

Milam is a participant in the Plan, which is sponsored and maintained by AEPSC. After the automobile accident, the Plan determined that Milam met its disability benefit eligibility requirements, and he began receiving long-term disability benefits on May 5, 2007, in the amount of $3,915 per month. In 2008, the Plan received information that Milam was receiving Social Security Disability Insurance in the amount of $2,025 per month. Pursuant to the Plan terms, Milam's monthly long-term disability benefits were reduced by his Social Security Disability Insurance to $1,890 per month.

Milam and his wife filed a lawsuit against the person involved in the automobile accident and his insurance company. The lawsuit was settled in April 2008, and pursuant to the settlement agreement, Milam, his wife, and his attorney received a check in the amount of

2

$250,000. The release signed by the Milams did not allocate the proceeds of the settlement between them, and their attorney, nor were the proceeds allocated to specific costs and expenses (for example, past and future medical expenses or lost wages). The Plan did not receive information about the settlement until August 8, 2009.

Prudential Insurance Company of America ("Prudential") is the third party claims administrator that has the authority and responsibility for administering the Plan's claims and review process. Prudential sent Milam a letter dated September 15, 2009 that explained it had received notice about his settlement award and that he would be notified in a separate letter as to any potential overpayment. (AR 0155-56.)[1] Prudential sent another letter to Milam dated September 21, 2009, explaining it would be offsetting Milam's settlement per the Plan provisions for a period of 60 months, and detailing Milam's appeal rights. (AR 0153-54.) Then, in another letter, dated October 6, 2009, Prudential explained that the overpayment of long-term disability benefits totaled $31,628.89. (AR 0152.) After adjusting for applicable taxes, the net overpayment was $29,732.20, which is the amount Prudential said Milam owed. (*Id.*) When broken down by year, the overpayment was $16,508.89 in 2008 and $13,223.31 in 2009. (AR 0005.) The letter requested that Milam fully reimburse the Plan for the overpayment by October 30, 2009. (AR 0152.)

Because the lump sum settlement payment did not relate to a particular period of time, the Plan did not seek reimbursement for any long term disability payments made during 2007 or from the beginning of 2008 until April 20, 2008. Instead, pursuant to its terms, the Plan sought to offset the benefits Milam received over the 60 month period beginning on the day he received his lump sum payment, April 21, 2008.

---

[1] "AR" is a citation to the Administrative Record, (Doc. 37), which is bates stamped.

Sometime after receiving Prudential's letter, Milam's attorney requested a copy of Prudential's "standard policy." The request was made after Milam's attorney reviewed a SOAP Note[2] written by Prudential claims manager Colleen Mahoney on September 23, 2009:

> [B]ased on review of the little we received in information regarding the TPL [third party liability] settlement, it is unclear as to whether any of it should be offset. . . . Based on our standard policy, unless the documentation shows that the compensation is for income replacement/loss of time, it should not be offset. . . . There is no breakdown included and one can assume based on the claimants injuries and settlement amt that at least a portion of it, if not all of the settlement is for medical costs-again unless settlement shows a loss of time payment amt, no offset should be applied.

(AR 0003.) William Truesdale was the Prudential employee who responded to Milam's attorney's request, explaining that he was the Prudential individual responsible for making Milam's benefit determination, and that Prudential was not going to produce a copy of the standard policy because it was not relevant to Milam's claims. (AR 148.) Milam's attorney repeatedly renewed his request for the standard policy, and the request was denied on each occasion. (*See, e.g.*, AR 0041–42, 0136.)

Milam requested that Prudential reconsider its decision to offset his long-term disability benefits, and to claim overpayment and seek repayment in the amount of $29,723.20. On May 4, 2010, Prudential issued a decision finding that its initial determination had been appropriate. Prudential cited the definition of "Other Income" and the provisions regarding the process of recovery as applied to the settlement in the plan documents, and reasoned:

> As stated in the AEP Plan, "all amounts that you receive in connection with a claim that involves 'other income' will reduce your benefits under this Plan, regardless of how the parties characterize the amount received (including money for attorney's fees.)" Therefore, regardless of the characterization of the amount received through Settlement, the full amount of $250,000.00 awarded in the Settlement is to be included in the calculation of the overpayment.

---
[2] SOAP Notes are internal records made by Prudential employees.

(AR 0130.) Prudential also advised that pursuant to the Plan's right of subrogation, Milam had to reimburse the Plan for the full amount of benefits paid under the Plan after he received the settlement award, regardless of whether he had been made whole. (AR 0131.) The letter instructed Milam that he could appeal the decision for a second time, but instead, on January 2011, Milam filed this lawsuit. (AR 0132.)

## B. Plan Documents

When Milam received his settlement award, the plan document in effect was the "2005 plan document." (AR 0195–99.) Then, pursuant to an administrative services agreement, Prudential began managing claims for benefits under the Plan on January 1, 2009, and a new plan document, referred to herein as the "2009 plan document," became effective. (AR 0170–77.) The 2009 plan document provides that "[e]ffective January 1, 2009, this plan governs the right of employees to continue receiving LTD benefits that were originally awarded under any prior American Electric Power System long-term disability plan." (AR 0170.) While the language in the two plan documents varies slightly, there are few substantive differences between the 2005 plan document and the 2009 plan document.[3]

## III. STANDARD OF REVIEW

Under federal law, a civil action may be brought by a participant or beneficiary of a disability benefits plan "to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to

---

[3] The parties do not discuss which plan document should apply. As a result, and because the language in the two plan documents varies only somewhat, this Court will not consider the issue now. *See Rodriguez v. Tennessee Laborers Health & Welfare Fund,* 89 F. App'x 949, 957 (6th Cir. 2004) (explaining that where a 1999 plan document contained one paragraph that a 1985 plan document did not, but "[t]he parties did not address the issue of which plan should govern at the district court level," the Circuit would not consider the issue on appeal).

future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). When reviewing a determination made by a plan administrator, a court must base its decision solely upon the administrative record, and evidence that was not presented to the plan administrator cannot be considered. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).

A plan administrator's denial of ERISA benefits is reviewed *de novo*, unless, as is the case here,[4] the benefit plan gives the administrator discretion to determine eligibility for benefits or to construe the terms of the plan. *Wilkins*, 150 F.3d at 613 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). When such discretion exists, courts review a plan administrator's decision using the highly deferential arbitrary and capricious standard of review. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). The arbitrary and capricious standard of review is appropriate even when the plan administrator delegates its fiduciary responsibilities to another fiduciary or third party. *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. App'x 734, 742 (6th Cir. 2005). "This standard 'is the least demanding form of judicial review of administrative action. . . .When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'" *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quoting *Perry v. United Food & Workers Dist. Unions 445 & 442*, 64 F.3d 238, 241 (6th Cir. 1995)).

This deferential standard, however, is not a simple formality: "the arbitrary and capricious standard . . . does not require [the Court] merely to rubber stamp the administrator's

---

[4] Both the 2005 and 2009 plan documents clearly vest the requisite discretion in the plan administrator, providing the plan administrator "full discretion and authority to determine eligibility for benefits and for continued benefits and to construe and interpret all terms and provisions of the plan." (2005 plan, AR 0207; 2009 plan, AR 0187.) Additionally, both plan documents specify that "[t]he Company has delegated its claims administration authority for reviewing and processing LTD claims" to a claims administrator. (2005 plan, AR 0203) (delegating to Broadspire/Aetna); (2009 plan, AR 0182) (delegating to Prudential).

6

decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). Instead, a plan administrator's decision will only be "upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

Milam argues that, based on a SOAP Note that reads "ER [the employer, AEP] is in agreement with the offset," (AR 0004), AEP may have improperly influenced Prudential's decision. Consequently, Milam contends, *de novo* review should be applied to the decision to offset Milam's long-term disability benefits. He cites no other persuasive parts of the Administrative Record or cases to support his position.

Milam's contention is unpersuasive. It is clear from the correspondence between Prudential, Milam, and Milam's attorney in the Administrative Record that Prudential, the third party claims administrator, made the final decision regarding Milam's benefits. (*See, e.g.*, AR 0129–133, 0152–156.) As the Plan points out, the most this SOAP Note shows is that AEP agreed with the decision made by Prudential. Even if that is the case, Prudential is the party that made the decision. The arbitrary and capricious standard of review applies in this case.

## IV. LAW AND ANALYSIS

### *A. Prudential's Standard Policy*

Based on the SOAP Note written by Prudential claims manager Colleen Mahoney discussed *supra*, Milam argues that Prudential's "standard policy" was relevant to his claim determination. Because Prudential did not ultimately consider the standard policy when making its determination, Milam contends the decision was arbitrary and capricious. The Plan had an obligation to produce the standard policy under various provisions of the ERISA regulations, Milam argues, but did not do so until after the litigation began, which was more than two years

after Milam's initial request for the policy.[5] (Doc. 30) (citing 29 C.F.R. § 2560.503-1(h)(2)(iii); 29 C.F.R. § 2560.503-1(m)(8)).

The Plan rebuts that Prudential's standard policy is simply not relevant to Milam's claim determination. The standard policy referred in the SOAP Note applies to Prudential's fully-insured plans, not the Plan, which is an AEP self-insured plan that is applicable to Milam. In addition, Truesdale, who made the determination, did not consult the standard policy as he deemed it inapplicable. The reference to the standard policy in the SOAP Note was in error.

Nothing on the administrative record indicates that the standard policy is applicable to Milam's claim determination, and the reference to the standard policy by Mahoney in the SOAP Note does, indeed, appear to be in error. The administrative record shows that Truesdale made Milam's claim determination and that he considered the 2009 plan documents, not the standard policy, when making the determination. Moreover, the administrative record clearly demonstrates that the 2009 plan document is the relevant document. It is attached as Exhibit A to the administrative service agreement between AEPSC and Prudential, which designates Prudential as the third party claims administrator. (AR 0248–269.) Exhibit E to the administrative service agreement lists Milam as a participant in the Plan governed by the 2009 plan document. (AR 0290.)

Milam attempts to apply language from the administrative service agreement and standard policy to support his argument that Prudential's standard policy is relevant. (AR 0270)

---

[5] The language in the standard policy would be advantageous to Milam. According to Mahoney's SOAP Note, settlement awards under the standard policy should not be offset unless the settlement documents indicate the compensation is for income replacement or loss of time. (AR 0003.) Under the 2009 plan document, however, all amounts received in connection with a claim that involves "other income" reduce the benefits "regardless of how the parties characterize the amount received (including recovery for attorney fees)." (AR 0176.) Milam's settlement proceeds were unallocated.

("*Such final determination shall be consistent* with Prudential's interpretation of the Plan, *with Prudential's claims procedures, . . .*") (emphasis added by Milam); (AR 0273) ("If and when Prudential becomes aware of a payment made for an amount in excess of the amount properly payable under the Plan, Prudential will take appropriate action, *in accordance with Prudential's standard procedures*, and with the Purchaser's cooperation to attempt to recover the excess payment") (emphasis added by Milam); (AR 0400) ("Prudential only provides the claim services specified in the ASO [administrative services only] Agreement which are agreed upon with the client when the case is sold. *However, our claim management is the same as for an Insured case.*") (emphasis added by Milam). This language does not directly reference the standard policy, making it of minor persuasive value.

The parties argue about which ERISA regulations apply. Milam argues that the relevant regulations are 29 C.F.R. §§ 2560.503-1(h)(2)(iii), (m)(8), and that under these regulations, the Plan had an obligation to produce Prudential's standard policy. The Plan retorts that Milam is relying on the incorrect regulations, that 29 C.F.R. § 2560.503-1(g)(v)(A) applies, and that under 29 C.F.R. § 2560.503-1(g)(v)(A), the Plan has no obligation to produce Prudential's standard policy.

Subsection (h) of 29 C.F.R. § 2560.503-1 is entitled "Appeal of adverse benefit determinations." 29 C.F.R. § 2560.503-1(h)(2)(iii) states, in pertinent part:

> [T]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures . . . [p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section.

9

29 C.F.R. § 2560.503-1(m)(8) states that a document is relevant if it was: (1) "relied upon in making the benefit determination"; (2) "submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination"; (3) demonstrates compliance with the administrative process and safeguards; or (4) in the case of a group health plan or a plan providing disability benefits, "a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination." Relying on subsection (2), Milam argues the standard policy was "considered" by Prudential even if it was not "relied upon in making the benefit determination." *See* 29 C.F.R. § 2560.503-1(m)(8)(2).

Subsection (g) of 29 C.F.R. § 2560.503-1 is entitled "Manner and content of notification of benefit determination," and 29 C.F.R. § 2560.503-1(g)(v)(A), which the Plan argues is applicable here, requires a disability benefit plan, when providing notice of an adverse decision, to provide the participant with any "internal rule, guideline, protocol, or other similar criterion *was relied upon in making the adverse determination*." (emphasis added).

It appears that both sections of the ERISA regulations would be relevant in this case because the Plan provided Milam with notice of an adverse decision, and Milam subsequently appealed the adverse benefits determination. Even though technically one Prudential employee may have considered its standard policy despite not relying on it when making Milam's benefit determination, the only evidence Milam presents to support this fact is one SOAP note written by an employee who ultimately did not make Milam's benefit determination. Prudential, on the other hand, has presented sufficient evidence in the Administrative Record to support its

assertion that the standard policy was referenced incorrectly. This Court will not construe the ERISA regulation to require a plan to produce to the claimant a document that was considered incorrectly. Doing so would create bad policy as the claimant would be barraged with inapplicable documents.

Finally, and perhaps most importantly, Milam does not explain how the fact that Prudential did not apply its standard policy—which is inapplicable to his claim—made its decision arbitrary and capricious. Applying a policy that does not apply in the first place would have been arbitrary and capricious.

### B. "Make Whole" Doctrine

The Sixth Circuit has adopted the "make whole" rule of federal common law, which requires that "an insured be made whole before an insurer can enforce its right to subrogation under ERISA, unless there is a clear contractual provision to the contrary." *Copeland Oaks v. Haupt*, 209 F.3d 811, 813 (6th Cir. 2000) (citing *Marshall v. Employers Health Ins. Co.*, Nos. 96-6063, 96-6112, 1997 WL 809997, at *4 (6th Cir. 1997) (per curiam)). The rule has been extended to cover reimbursement provisions as well. *Hiney Printing Co. v. Brantner*, 243 F.3d 956, 959–60 (6th Cir. 2001); *Rodriguez v. Tennessee Laborers Health & Welfare Fund,* 89 F. App'x 949, 957 (6th Cir. 2004). In order for a plan to "conclusively disavow the default rule, it must be specific and clear in establishing *both* a priority to the funds recovered *and* a right to any full or partial recovery." *Copeland Oaks*, 209 F.3d at 813–14.

Milam argues the Plan does not properly disavow application of the "make whole" rule. In the 2005 and 2009 plan documents, Milam contends, there is no reference to a right to any full or partial recovery in the "Other Income" provision, there is no reference to the "make whole" rule in the "Right to Recovery" provision, and that the "make whole" language in the

11

"Right of Subrogation" section is not specific enough.  The Plan rebuts that the "make whole" rule does not apply because the Plan "expressly disavows it in specific unambiguous terms establishing a priority to the funds recovered and a right to recovery."  (Doc. 35 at 9.)

The "Other Income" sections of the 2005 and 2009 plan documents explain that "any disability benefits you may receive under the plan will be reduced by other income you receive from other sources for the period you are entitled to benefits under this plan," including "[s]ettlments and judgments resulting from a lawsuit whose cause of action is based on the illness, injury disability entitling you to benefits under this plan."  (AR 0174, 2009 plan document) (*accord* AR 0196, 2005 plan document.)   The 2009 plan document states that "Other Income" will reduce benefits under the Plan "regardless of how the parties characterize the amount received (including recovery for attorney fees)."  (AR 0176.)  Moreover, the "Right of Subrogation" provisions use the "make whole" language:

> If you bring a liability claim against a third party, benefits payable under the plan must be included in that claim as well as in any recovery you obtain, either by judgment, settlement, or otherwise, and you must reimburse the plan for the full amount of benefits paid under the plan, regardless of whether you have been "made whole" as a result of payments by that third party.

(AR 0177, 2009 plan document) (*accord* AR 0199, 2005 plan document).

In *Copeland Oaks*, the Sixth Circuit had to determine whether a plan had sufficiently disavowed the "make whole" rule.  209 F.3d at 813–15.  The plan language at issue stated:

> The Covered Person agrees to recognize the Plan's right to subrogation and reimbursement.  These rights provide the plan with a priority over *any* funds paid by a third party to a Covered Person relative to the Injury or Sickness, including a priority over any claim for non-medical or dental charges, attorney fees, or other costs and expenses.

*Id.* at 813 (emphasis added by *Copeland Oaks* court).  The *Copeland Oaks* court held that "in order for plan language conclusively to disavow the default rule, it must be specific and clear in

12

establishing *both* a priority to the funds recovered *and* a right to any full or partial recovery." *Id.* Because the plan language at issue failed to establish "its priority right over any *partial* recovery," the court found the district court properly applied the "make whole" rule when it found the plaintiffs and their employee benefits plan were precluded from exercising their subrogation or refund rights. *Id.* at 812–14.

Similarly, in *Hiney Printing*, this Circuit found that the following language, while establishing first priority to any funds, did not unambiguously establish a right to any full or partial recovery as well: "Any amounts so recovered, however designated, shall be apportioned as follows: this Plan shall be reimbursed to the extent of its payments under this plan of health coverage." 243 F.3d at 958–59.

This Court finds, as in *Copeland Oaks* and *Hiney*, the language in the Plan does not sufficiently disavow the "make whole" rule because it fails to establish a right to any full or partial recovery. The subrogation provision states that "benefits payable under the plan must be included in the claim as well as *any* recovery you obtain," but it is silent on the issue of full or partial recovery. *See* (AR 0177, 2009 plan document) (*accord* AR 0199, 2005 plan document); *Copeland Oaks*, 209 F.3d at 813 (plan language stating: "[t]hese rights provide the plan with a priority over *any* funds paid by a third party to a Covered Person relative to the Injury or Sickness") (emphasis added by *Copeland Oaks* court). The problem is that although the Plan tries to claim that it has a right to "any recovery," it is not clear that if Milam only recovers partially—as very well could be the case here where his settlement was unallocated—the Plan has a right to these funds. Although the Plan uses the words "regardless of whether you have been 'made whole,'" this Circuit has already held that such words are insufficient to disavow the "make whole" rule. *Rodriguez*, 89 F. App'x at 957 ("Although the 1999 Plan states that the

'make whole' doctrine does not apply, the 1999 Plan does not establish who has priority to any recovered funds or whether the Plan has a right to full or partial recovery . . . . Absent such language, the 1999 Plan has not sufficiently disavowed the 'make whole' doctrine.").

This finding is in accord with the reasoning for the "make whole" rule as set forth in *Marshall*: "[s]uch a rule is consistent with the equitable principle that insurer does not have a right of subrogation until the insured has been fully compensated, unless the agreement itself provides to the contrary." 1997 WL 809997, at *4. Without sufficiently disavowing the "make whole" rule, therefore, the Plan cannot exercise its right to subrogation or reimbursement against Milam unless and until he has been made whole.

The parties have not sufficiently discussed whether Milam has been made whole in their briefs. The Court, therefore, **ORDERS** the parties to brief the issue of whether Milam has been made whole. The parties should file opening briefs in 21 days, or by October 15, 2012, and response briefs 14 days thereafter, or by October 29, 2012.

*C. Counter-Claim*

The Counter-Claimants ask this Court to enforce the Plan, impose a constructive trust on alleged overpaid benefits in Milam's possession, uphold the Plan's right to obtain reimbursement from Milam, and offset Milam's future benefits for 60 months. As explained above, the Plan has not sufficiently disavowed the "make whole" rule. Once the parties have briefed the issue of whether Milam has been made whole, and this Court makes a determination as to whether Milam has been made whole, it can determine whether the Plan can recover benefits it has paid to Milam.

*D. Reinstatement of Benefits*

Relying on his position that this the Plan improperly failed to give him access to Prudential's standard policy during the administrative proceeding, Milam argues that this Court should: (1) remand this case to the claims administrator for "full and fair inquiry," and in so doing, this Court should "afford Milan an additional opportunity to submit evidence and argument related to the application of the 'standard policy,'" (Doc. 30 at 18); and (2) reinstate Milam's benefits pending review.

This Court found above that that Prudential's standard policy was not relevant to Milam's claim determination. It is, therefore, unnecessary to remand this case to the claims administrator. Rather, the next step will be for this Court to make a determination as to whether Milam has been made whole after the parties have provided further briefing on the issue.

Milam relies on *Wenner v. Sun Life Ins. Co. of Canada*, 482 F.3d 878 (6th Cir. 2007) and *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590 (6th Cir. 2001) to argue that his benefits should be reinstated until this case is resolved. In both cases the Sixth Circuit held that where a plaintiff's benefits had been improperly terminated in the denial and/or appeals process, the benefits were to be reinstated pending new review. *Wenner*, 482 F.3d at 883–84; *Sanford*, 262 F.3d at 599. Benefits terminated in violation of law have "never been properly revoked . . . and should continue until a decision regarding the potential revocation of . . . benefits properly determined." *Sanford*, 262 F.3d at 599.

The same reasoning applies here where there has not yet been a determination that Milam was made whole prior to the Plan ceasing benefit payments and seeking reimbursement. This Court finds Milam's benefits should be reinstated until a determination has been made regarding whether he has been made whole.

## V. CONCLUSION

For the foregoing reasons, Milam's Motion for Judgment on the Administrative Record is **DENIED**, the Plan's Motion for Judgment on the Administrative Record is **DENIED**, and Counter-Claimants' Motion for Summary Judgment on their Counter-Claim is **DENIED**. The parties are **ORDERED** to brief the issue of whether Milam has been made whole. The parties should file opening briefs in 21 days, or by October 15, 2012, and response briefs 14 days thereafter, or by October 29, 2012. Milam's benefits shall be reinstated until there has been a determination as to whether he has been made whole.

**IT IS SO ORDERED.**

                                        **s/ Algenon L. Marbley**
                                        **Algenon L. Marbley**
                                        **United States District Judge**

**Dated: September 24, 2012**